| | |
|---|---|
| + District Court, Denver County, Colorado<br>1437 Bannock Street<br>Denver, Colorado 80202<br>(720) 865-8301 | DATE FILED: May 11, 2018 9:50 AM<br>FILING ID: E0BCDE92E381D<br>CASE NUMBER: 2018CV31749 |
| SHANNON STEWARD,<br><br>       Plaintiff,<br><br>v.<br><br>AMERESCO, INC<br><br>       Defendant. | ▲Court Use Only ▲ |
| *Attorney for Plaintiff*:<br>Offices of John W. McKendree,<br>Lawyer and Consultant<br>John W. McKendree, #1209<br>7582 East 121st Drive<br>Thornton, CO 80602<br>Phone Number:   (303) 618-8780<br>E-mail: jwm@mckendreelaw.com | Case Number:<br><br>Div:<br><br>Crtrm: |
| **VERIFIED COMPLAINT AND JURY DEMAND** | |

COMES NOW, Plaintiff, SHANNON STEWARD, by and through her attorney of record, JOHN W. McKENDREE, Offices of John w. McKendree, Lawyer & Consultant, and hereby respectfully submits this Verified Complaint and Jury Demand and alleges and avers as follows:

## JURISDICTION, VENUE, and PARTIES

1.      At all times material, Plaintiff, Shannon Steward [Hereafter, "Plaintiff"] lived in the State of Colorado, and resided at 7160 Red Mesa Drive, Littleton, Colorado 80125; and at all times material was employed by Defendant, Ameresco, Inc., in the State of Colorado.

2.      At all times material, Defendant, Ameresco, Inc. [Hereafter, "Defendant Ameresco"] operated and did business throughout the United States, Canada and the United Kingdom, including in the State of Colorado, where business was conducted at 3095 South Parker Road., Suite 200, Aurora, Colorado 80014.

3.      At all times material, Tyrus Miller, Operations Manager for Defendant, Ameresco, Inc, [Hereafter, "Miller"] operated and did business out of 3095 South Parker Road., Suite 200, Aurora, Colorado 80014.

4.      At all times material, Chuck Silkman, Regional Director for the Rocky Mountain Region for Defendant, Ameresco, Inc, [Hereafter, "Silkman"] operated and did business out of 3095 South Parker Road., Suite 200, Aurora, Colorado 80014.

5.      Pursuant to Colo. R. Civ. P 98 (c), Venue is appropriate in the District Court for Denver County based upon the fact that Plaintiff was employed by the Defendant in the State of Colorado; Defendant's illegal actions alleged herein where committed in the State of Colorado, and Defendant's Registered Agent is located in Denver County, State of Colorado.

6.      Jurisdiction is proper in this Honorable Court, based upon the fact that Defendant conducts and transacts business within the State of Colorado, the events which give rise to this Complaint occurred within the State of Colorado, and Plaintiff suffered injuries, damages, and losses as a result of Defendant's unlawful conduct as alleged herein, in the State of Colorado.

7.      Plaintiff's suit is for Retaliation and Wrongful Termination in violation of Colorado's Public Policy as expressed in its Worker's Compensation Scheme, §§8-40-101, *et seq.*, and for Fraud and Deceit.

## GENERAL ALLEGATIONS

8.     Plaintiff's incorporates by reference each and every allegation contained in ¶¶ 1-7 of this Verified Complaint and Jury demand.

9.     Plaintiff began her employment with Defendant, Ameresco, in Parker, Colorado, on or about August 11, 2014, as the Proposal Coordinator.

10.     Defendant, Ameresco, is a leading independent provider of comprehensive energy efficiency and renewable energy solutions for facilities throughout North America and the United Kingdom.

11.     As the Proposal Coordinator for Defendant, Plaintiff worked with Defendant and other local, state and governmental entities in Colorado, Montana and Nebraska[1], by providing comprehensive energy efficiency and renewable energy solutions and the execution of those changes along with office support; and throughout the Plaintiff's tenure, duties grew to include providing on-site support to multiple clients.

12.     Due to Defendant's business and contractual relationships with local, state and governmental entities, Defendant Ameresco's Experience Modification Rate ["EMR"] plays a key role in whether Defendant Ameresco is eligible to bid for Federal, state or other municipal work and the ability to continue to bid on contracts which have been previously secured.

13.      Any report of lost wages and other medical claims by Defendant, would result in a negative impact upon the Defendant's EMR[2] number, which would ultimately result in an

---

[1] Office in Aurora that serves Colorado, Nebraska and Montana is referred to as the "Rocky Mountain Regional Office."
[2] At the time of the Plaintiff's wrongful termination, Defendant's EMR was approximately .65/.68.  In order for Defendant to maintain Federal, State and municipal work, and to avoid incurring greatly increased insurance rates, the EMR rating would have to remain at that number.  The Department of Defense Best Practice Guide indicates that an EMR for a prime contractor is considered Superior at .70 or below.  Acceptable at .70 to 1.00 and Substandard if greater than 1.0. These numbers are similar for state and local municipalities. This number remains part of the defendants EMR record for 3 years. (per www.workerscompconsultant.com)

enormous loss of work for Defendant as a major portion of their business comes from Federal, State and municipal clients. In the Rocky Mountain Region, these major contracts include the City and County of Denver and the City of Boulder.

14.     Throughout Plaintiff's tenure with Defendant, she reported to Silkman, and, also supported Miller, along with others in the Colorado, Montana and Nebraska offices.

15.     As part of a non-traditional contract for services with the City of Boulder, checks were required for permits and fees. Miller was unsure how to request checks of this nature and directed the Plaintiff to execute this process[3] because the directive of which contained a false representation of a material fact which Miller knew was false or in the regular course of duty, reasonably should have known it was false and in violation of company policy; knowing that the Plaintiff was without knowledge regarding such policy; and that Miller issued this directive with the intent that Plaintiff act upon his directive when he knew or should have known it was a violation of company policy; Plaintiff followed Millers directive on this occasion and on this occasion, following the representations of Miller caused the Plaintiff damage as set forth herein.

16.     The Plaintiff was never trained by any official of Defendant, on processing a Request for Check Payment.

17.     The first time Miller directed the Plaintiff to process a Request for Check Payment was on or about April 17, 2017, Miller told the Plaintiff that he, "did not know how to get the ball rolling;" i.e., the procedure to be followed to process a Request for Check Payment.

---

[3] Once the Plaintiff submits the Request for Check Form to Accounts Payable electronically, the Plaintiff also requests a Purchase Order and attaches the Form to the Purchase Order Request.  It is then further processed by Bindu Veetekat, Accounts Payable, and approved by the project administrators electronically; the check is then issued by Accounts Payable.  (The Plaintiff may also provide a Fed Ex label for the shipping of the check, but has no other involvement in the process, nor receives or delivers the check to the recipient.)  Miller or his assistant Scott Logan received the checks requested by the Plaintiff.

18.     When the Plaintiff was initially directed by Miller to initiate the process to request a check, she was told by Bindu Veetekat, Accounts Payable [Hereafter, "Ms. Veetekat"] via email, to fill out a Request for Check Form. The Plaintiff asked who should be listed as the "Approver" on the form, Ms. Veetekat told her it was who was in charge of the project that the check was billed to; Ms. Veetekat did not disclose that the Request for Check Payment was improper if executed by Plaintiff.

19.     Upon completing the form, the Plaintiff spoke to Miller on the phone to inform him what the process was per Ms. Veetekat; Plaintiff asked Miller what she should do about the "Approved By" line, the Plaintiff asked if she should wait for him to sign it when he returned to the office or ask Silkman to sign in when he returned to the office later that day. Miller replied, "Just go ahead and sign my name.  I trust you!  I want to get this out today;" which directive t Miller, should have known with a degree of diligence, would result in Plaintiff's termination if she followed his order; Miller did not disclose any concern.

20.     Thereafter, Miller was out of town and/or out of the office and directed the Plaintiff on additional occasions to begin the paperwork (submission of the Request for Check Payment Form) for the City of Boulder, Brenton Building Project permits and fees, stating "work your magic and get me a check"[4], once the Plaintiff had submitted the Form, and attached it to the Purchase Order request electronically; it was then approved up the chain, including by Miller.

21.     The procedure of Plaintiff filling out and submitting the Request for Check Payment form with Mr. Miller's directive and approval had occurred several times and no one ever told the Plaintiff that she was doing anything wrong or that she was in violation of any

---

[4] Checks are regularly cut on Wednesdays and needed to be requested approximately a week ahead of time.  In the cases of the checks needed by Mr. Miller, they were needed within 2-3 days' notice.

company policy; additionally, the checks issued without any dispute, problem or notice to the Plaintiff that it was a violation of company policy which libeled her for termination.

22.     Copies of the Request Forms with Defendant Miller's name applied by the Plaintiff as directed by Defendant Miller, were sent to Defendants Miller and Silkman as well as saved on the company's shared server, and at no time did the Plaintiff try to hide this fact from the Defendant, nor did she have to hide the fact since it was known throughout the processing of the checks.

23.     On March 8, 2018, Plaintiff had a 9:00 a.m. Meeting with officials from the City of Boulder Facilities Management Department to discuss the move of the occupants in the Brenton Building.

24.     While walking up to the Facilities Management Building, in Boulder, Colorado, Plaintiff tripped on the curb and fell to the ground on her right wrist and knee; although the Plaintiff was in extreme pain, she got up and attended the meeting as described in ¶23.

25.     During this meeting with officials of Boulder, the Plaintiff knew she damaged her right arm as she was unable to move it, it began to swell and the pain was increasingly intolerable.

26.     Dedicated to her responsibilities as the Proposal Coordinator for Defendant, Plaintiff went on to the Municipal Building following her meeting in the Facilities Building with officials of Boulder, to meet with the occupants that would be moving; after about 30 minutes, Plaintiff knew something was absolutely wrong and knew she needed to seek medical attention.

27.     At or about this time, Plaintiff received an email from Miller regarding a Check Request that needed to be fulfilled for a Solar Project with Boulder, Colorado, which required 2

separate checks; after looking back, Plaintiff realized Miller had directed her to fulfil this request a few days prior.

28.     Realizing the urgency, acknowledging Miller was in California, and not wanting to further delay the process, Plaintiff followed Miller's directive and submitted a Request for Check Payment Form for 2 Checks[5]; following the same procedures as before.

29.     Not yet knowing the extent of her injury, Plaintiff went to Swedish Health One Urgent Care and after examination, was told that she had suffered a Radial Head Fracture to her right arm and a sprained wrist; the Plaintiff's arm was placed in a splint and she had to call for a ride as she was unable to drive herself home.

30.     Since Miller was in California, the Plaintiff contacted Silkman by phone; she began the conversation discussing the Check Requests that she was directed to submit a few days ago for Boulder, and how she had just submitted them earlier that day; she also apologized for "dropping the ball", she then explained to him that there were communications between herself and Ms. Veetekat wherein Ms. Veetekat was requesting approval[6] from Lou Maltezos, Executive Vice President for Defendant.

31.     Silkman seemed confused as he stated to the Plaintiff, "Why are they pushing for such high approval? Forward the email from Bindu to me and I will take care of it."

32.     During this same conversation, the Plaintiff went on to tell Silkman about the injury to her arm that had occurred on her way into the meeting with officials of Boulder.

---

[5] Request for Check Payment: City of Boulder, Planning and Development/ 1739 Broadway, Boulder, CO 80302, Project Number: 37137 in the amount of $38,502.19; and Request for Check Payment: City of Boulder, Planning and Development/ 1739 Broadway, Boulder, CO 80302, Project Number: 37137 in the amount of $13,169.39.
[6] Ms. Veetekat stated in her email that a signed form was not necessary, just an email documenting his approval.

33.     During her telephone call with Silkman, during which she explained to him both Miller's Check Request Form and Plaintiff's worker's compensation injury, Silkman made no statement that the Check Processing Request Form libeled her for termination.

34.     Silkman told the Plaintiff he would speak with Safety Officer Ken Gross.  Later that day, Mr. Gross emailed the Plaintiff an Accident Report form, which she filled out and returned on the same day.

35.     The following day, the Plaintiff was contacted by Defendant Ameresco's Human Resource Department who told her to wait for Zurich (Defendant's Insurance Company) to reach out to her. Also on this day, Plaintiff went to an Orthopedist, as directed by the ER, who confirmed her diagnosis.

36.     On or about March 12, 2018, Plaintiff was contacted by Silkman who was under the impression that Zurich had already been in contact with her; she explained to him that she had not yet been contacted by Zurich and went on to explain the tasks she has been able to complete since her work related injury.

37.     Silkman went on to state that based on her arm, he was not comfortable with her driving and that it didn't sound like she could type, so Workers Compensation would have to handle it; he also directed the Plaintiff to call Miller and fill him in on the "Boulder details" and to "transfer all her files to the server" since she would probably "be down for 2 weeks" before being able to return to the Boulder site.

38.     At no time during this telephone conversation wherein Silkman disclosed actual knowledge of Plaintiff's Worker's Compensation Injury and Worker's Compensation procedures, did Silkman provide any advice or directive to Plaintiff, or warning in respect to the most recent Check Request she had earlier discussed with him.

8

39.     Shortly thereafter, Plaintiff received a call from Allen Hecker from Zurich.  He inquired why the Plaintiff had not yet gone to a Colorado-approved occupational doctor.  He stated that her company safety officer should have provided her with a list of approved doctors after she submitted her accident report.  He explained that all determination of work restriction must come from the occupational doctor, but that Ken Gross had already informed him that Plaintiff could perform all of her duties without restriction. He directed her to set an appointment with one of the approved physicians from his list and directed her to bill all medical expenses to Worker's Compensation Number 2230397536.

40.     Plaintiff received an email from Ms. Deven Heroux, requesting for a list of restrictions from her doctor.  Plaintiff's orthopedist provided a letter stating Plaintiff could not use her right arm or hand, which must remain splinted until her next appointment 2 weeks later, and could not drive. This letter was immediately sent to Ms. Heroux, Silkman and Mr. Gross.

41.     Shortly thereafter Plaintiff received an email from Silkman reversing his verbal directives, and stating that Safety Officer Ken Gross had determined that she could complete all of her duties from home and that any missed time from her injury should be charged to sick time or vacation time.  Plaintiff responded that she was unsure how she was capable of that. Plaintiff also explained that Mr. Hecker from Zurich stated that the determination of her restrictions was to be made by the Colorado-approved occupational physician. This email evidence Silkman and Ameresco's retaliatory motivation for Plaintiff's pursuing her entitlement for benefits under the Worker's Compensation statute.

42.     Silkman directed Plaintiff to provide a chart showing time worked, time not worked and time spent at doctor's appointments.

43.     The next day, on March 15, 2018, Plaintiff saw a Colorado Workman's Compensation approved Physician wherein she spoke to him about her restrictions and capabilities.

44.     In response, the Worker's Compensation physician said, "nobody's gonna want to pay for you" and provided her with a document of restrictions; Plaintiff immediately provided the documentation to Silkman, Ms. Heroux, Mr. Gross and Mr. Hecker. At this time she also sent the chart of time worked, time missed and time at doctor's appointments. As requested by Mr. Hecker and Silkman, Plaintiff indicated that she would only be able to complete her work duties for about 2-3 hours per day, in lieu of 7.

45.     On March 16, 2018, the Plaintiff was asked to "jump on a call." At or about 10:00am, Plaintiff began a phone conference with Silkman and Ms. Deven Heroux, Senior HR Business Partner, wherein Silkman began the conversation stating, "I hope your arm is feeling better."

46.     Silkman went on to say that the reason he was calling was regarding a form she "signed with someone else's name on it which was clearly a violation" and that the Plaintiff was being "terminated immediately."

47.     Ms. Heroux stated, "Since you violated company policy, we have calculated your vacation days, and a package will be sent FedEx with an Acknowledgement of your Termination, sign the paperwork and get it turned in."

48.     Ms. Heroux then asked the Plaintiff if she had any questions, the Plaintiff was shocked, confused and emotional, she asked, "What did I do wrong?" wherein Ms. Heroux stated, "You are very hard to understand"; Silkman said, "you signed a Check request with Ty's name clearly violating company policy."  Plaintiff replied "but that's how I did it in the past.  He

told me I could.  That's how we always request checks."  To which Silkman said "well this time it was unauthorized."  Plaintiff stated she had no more questions and the conversation ended.

49.     This statements made by Silkman in ¶¶46 and 48, were plainly false, pretextual and demonstrated the termination decision was in retaliation for Plaintiff's exercise of her rights and obligations under the Worker's Compensation Statute, since Miller directed to her to execute the Check Request and understood he was unable to sign it as they were both in the field all week. The conversation ended and nothing was said about how the Plaintiff should proceed with her pending Workers Compensation Claim.

50.     Plaintiff injured her arm while executing her job duties for Defendant, filed a claim for Workman's Compensation, and was abruptly terminated based upon a frivolous claim that she "signed a Check Request with Ty's name" and that "this time it was unauthorized;" in violation of the public policy of the State of Colorado as set forth in its Worker's Compensation Scheme §§8-40-101, *et seq*, CRS.

51.     During every step of the Request for Check Payment process, officials knew that the Plaintiff was the individual who filled out the Request Form, just like she had done previously when she followed the directives of Miller prior to this occasion[7].

52.     Prior to the filing of Plaintiff's Workers Compensation Claim, Plaintiff had done nothing different in the execution of her job duties, there was an absence of performance related issues and Plaintiff was never notified that what she was being directed to do was in violation of Defendant's policies.

---

[7] Officials of Defendant never raised an issues with the Plaintiff regarding a violation of company policy until her termination; the Plaintiff was not acting maliciously as she was following the directives of Mr. Miller as she had done on several different occasions prior.

53.     After the filing of Plaintiff's Workers Compensation Claim, Claim Number: 2230397536, and the submission of her Lost Wages Spreadsheet on March 15, 2018, the Defendant wrongfully terminated the following day on March 16, 2018, for pretextual and frivolous reasons, masking Defendant's real motivation to terminate the Plaintiff for invoking her rights and privileges as a worker and in clear violation of the Public Policy of Colorado as set forth in §§ 8-40-101, *et seq*., CRS.

<u>**PLAINTIFF'S FIRST CLAIM FOR RELIEF**</u>
**Retaliation and Wrongful Termination in violation of**
**Colorado's Public Policy as explicitly set forth in §§8-40-101, *et seq*.**

54.     Plaintiff's incorporates by reference each and every allegation contained in ¶¶ 1-53 of this Verified Complaint and Jury demand.

55.     As mentioned *supra*, in ¶7, Plaintiff began her employment with Defendant in Parker, Colorado, on or about August 11, 2014, as the Proposal Coordinator.

56.     Plaintiff was injured while executing her job duties for Defendant; thereafter she notified Defendant of this injury and proceeded to exercise privileges entitled to her as an employee, by filing a Claim for Worker's Compensation.

57.     Defendant, was aware or reasonably should have been aware of Plaintiff's Worker's Compensation Claim at the time of their retaliatory and wrongful termination of the Plaintiff.

58.     Defendant's actions in retalitorily terminating the Plaintiff, violates public policy since Defendant's actions contravene the clear mandate of public policy as the decision at issue on terminating the Plaintiff was both material and temporal to Defendant's knowledge of Plaintiff's pursuit of a worker's compensation claim and was the reason for her termination for which Plaintiff suffered damages she is entitled to have remedied under Colorado law.

12

59.     Plaintiff, as an employee of Defendant, during all times material, had the right to file a claim for Worker's Compensation and to collect benefits on that claim; Defendant contravened Colorado's Common Law Public Policy when it wrongfully terminated the Plaintiff in retaliation for invoking that right.

60.     As a result of Plaintiff filing her Worker's Compensation Claim, Plaintiff was wrongfully terminated in retaliation for exercising an important job-related right or privilege.

61.     Plaintiff exercised an important job-related right or privilege and Defendant retaliated against her for exercising her right to receive Worker's Compensation Benefits.

62.     Defendant prohibited the Plaintiff from exercising an important job-related right or privilege when they wrongfully terminated her employment in retaliation for filing Workers Compensation Number: 2230397536.

63.     Defendant was aware or reasonably should have been aware that their actions in wrongfully terminating the Plaintiff in retaliation for filing a Worker's Compensation Claim was violative of the Plaintiff's legal right or privilege as a worker and the Public Policy of the State of Colorado.

64.     As a direct and proximate result of Defendant's actions, Plaintiff suffers and continues to suffer injury including, but not limited to, severe emotional distress, mental anguish, physical pain and suffering, psychological and emotional pain and suffering, including psychological damage.

65.     As a direct and proximate result of Defendant's intentional conduct, Plaintiff also suffers pecuniary losses including, but not limited to, lost wages, future lost wages and benefits, diminished opportunities for career advancement, damage to her reputation and damage to her

re-employment opportunities, attorney's fees, interest in any judgment, and for such other and

further relief as the Court deems just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Honorable Court enter Judgment in her favor and

against the Defendant as follows:

(a)      On Plaintiff's First Claim for Retaliation and Wrongful Termination in violation

of Colorado's Common Law Public Policy, in an amount to be determined at trial.

## JURY DEMAND

Plaintiff, Shannon Steward, respectfully demands a Trial by Jury on all issues presented

herein.

Respectfully submitted this 10th day of May, 2018.

OFFICES OF JOHN W. McKENDREE,
LAWYER & CONSULTANT


*s/s John W. McKendree*
John W, McKendree, #1209
7582 E. 121st Drive
Thornton, CO 80602

In accordance with C.R.C.P. 121§ 1-26(7), a printed copy of this document with original signatures is maintained by the filing part and will be made available for inspection by other parties or the Court upon request.

**Plaintiff's Address:**

7160 Red Mesa Drive
Littleton, Colorado 80125

## **VERIFICATION**

STATE OF COLORADO                    )

                                     ) s/s

CITY AND COUNTY OF _Douglas_         )


I, Shannon Steward, have had the Verified Complaint and Jury Demand read aloud to me, and I certify that the information contained herein is true and correct and to the best of my knowledge, information and belief.

s/s _____

Shannon Steward, Plaintiff


Subscribed and sworn to before me this _10_ day of May, 2018 by Shannon Steward.

Witness my hand and official seal.

s/s _____
Notary Public


My Commission Expires:                    {{SEAL}}

EMILY EHLERS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID # 20144028854
MY COMMISSION EXPIRES JULY 23, 2018

15